<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *    )
 3    UNITED STATES OF AMERICA,        )      Criminal Action
                                       )       No. 23-00032
 4                    Plaintiff,       )
                                       )
 5       vs.                           )
                                       )
 6    VICTOR SEAN DENNISON,            )      Washington, D.C.
                                       )      August 28, 2024
 7                    Defendant.       )      3:04 p.m.
                                       )
 8    * * * * * * * * * * * * * * *    )

 9

10            TRANSCRIPT OF ORAL RULING AND SENTENCING
            BEFORE THE HONORABLE TREVOR N. McFADDEN
11                 UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14

15    FOR THE GOVERNMENT:      BRENDAN BALLOU, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
16                               FOR THE DISTRICT OF COLUMBIA
                               950 Constitution Avenue, Northwest
17                             Washington, D.C. 20530

18                             ELIZABETH N. ERIKSEN, ESQ.
                               U.S DEPARTMENT OF JUSTICE
19                             1301 New York Avenue, Northwest
                               Eighth Floor
20                             Washington, D.C. 20005

21    FOR THE DEFENDANT:       UBONG AKPAN, ESQ.
                               OFFICE OF THE FEDERAL PUBLIC
22                                 DEFENDER
                               625 Indiana Avenue, Northwest
23                             Suite 550
                               Washington, D.C. 20004
24

25    FOR U.S. PROBATION:      CRYSTAL LUSTIG
</pre>

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  THE COURTROOM DEPUTY:  This is Criminal Case
 2   23-32, United States of America versus Victor Sean Dennison.
 3                  Can the parties please come forward to identify
 4   yourselves for the record, starting with the Government.
 5                  MR. BALLOU:  Good afternoon, your Honor.  Brendan
 6   Ballou, joined by Trial Attorney Beth Eriksen, FBI Agent
 7   Arnesha Bahn and paralegal Rachel Marcelin.
 8                  THE COURT:  Good afternoon, folks.
 9                  MS. AKPAN:  Good afternoon, your Honor.  Ubong
10   Akpan on behalf of Mr. Dennison.  I'm joined at counsel
11   table by my paralegal intern, Ms. Olivia Rae Okun-Dubitsky.
12                  THE COURT:  Good afternoon.
13                  All right.  Anything before I deliver the verdict
14   on the pending counts?  Mr. Ballou?
15                  MR. BALLOU:  Nothing from the Government, your
16   Honor.
17                  THE COURT:  And Ms. Akpan?
18                  MS. AKPAN:  No, your Honor.
19                  THE COURT:  All right.  I make the following
20   findings of fact and conclusions of law in support of the
21   Court's verdict in United States versus Victor Sean
22   Dennison.  This verdict is rendered in full recognition of
23   the standard jury instructions, including, but not limited
24   to, the Government's burden to prove its case beyond a
25   reasonable doubt.  It is made having carefully considered
```

1    the testimony presented and the evidence admitted during the

2    course of the trial.

3            I am using the offense elements and definitions

4    that I discussed at the outset of the trial.

5            Before I begin, I want to provide a few general

6    remarks about the credibility of the witnesses who testified

7    before me.  Unlike most cases, this one overwhelmingly

8    relied upon videotape evidence showing exactly what occurred

9    during the time in question.  Indeed, there are few

10   questions here about what occurred when.  The central

11   questions are one of intent and the legal implications of

12   these actions.  This somewhat diminishes the importance of

13   the eyewitness testimony here.

14           As a general matter, I found the testimony of the

15   Government's witnesses to be credible.  They struck me as

16   trying to give an honest recollection of the events to which

17   they testified and not motivated by bias for or against any

18   party.  I fully credit their testimony in all essential

19   respects.

20           First, I find the Government has properly

21   identified the Defendant in the Government exhibits showing

22   his actions and whereabouts on the Capitol grounds on

23   January 6th, 2021.  Mr. Dennison has all but conceded as

24   much.

25           Count 1 charges Mr. Dennison with entering or

1    remaining in a restricted building or grounds, in violation

2    of 18 USC 1752(a)(1).

3                A restricted building or grounds means any posted,

4    cordoned-off or otherwise restricted area of a building or

5    grounds where a person protected by the Secret Service is or

6    will be temporarily visiting.

7                The first element is that he entered or remained

8    in a restricted building or grounds without lawful authority

9    to do so.

10                Second, the Government must show that he did so

11    knowingly.

12                I find that the Capitol grounds were restricted as

13    outlined in Government's Exhibit 101 and testified to by

14    Captain Patton and Agent Hawa.  I find that this area was

15    established by the Capitol Police and accepted or adopted by

16    the Secret Service as a protective perimeter and restricted

17    area for purposes of the vice president's visit.

18                However, I think it is uncontested that the snow

19    fencing and bike racks were removed, usually by protesters,

20    in areas over the course of January 6th, and there is little

21    evidence before me about exactly when or where Mr. Dennison

22    entered the restricted area or what he would have seen when

23    he did so.

24                Therefore, while I think he did cross into the

25    restricted area at some point, I'm not sure that he would

1     have known when he did this.

2            Nonetheless, by the time he entered the Senate

3     wing door, he was amply on notice that he had entered a

4     restricted area.  By this point, he had climbed the

5     temporary and unfinished scaffolding for the inauguration

6     stage, climbed the stairs to the upper terrace where rioters

7     were scaling the wall and hanging off the bannister, seen

8     the absolute chaos and riot-type atmosphere of the upper and

9     lower west terraces, and entered the Capitol while other

10    rioters were climbing in through a broken window right next

11    to him.

12           Indeed, he said he was right behind someone who

13    broke a Capitol window with a hammer.  He also said that he

14    saw people breaching the doors and the window of the

15    Capitol.  I'm looking to Exhibit 205.

16           Upon entering the Senate connecting corridor, he

17    saw people yelling, chanting, waving flags and facing off

18    with officers.  I'm looking to Exhibit 305 from 27 minute --

19    27 seconds to 2 minutes, and 306-A from 12 seconds to

20    25 seconds.  It is inconceivable that Mr. Dennison didn't

21    realize he was in an area he was not supposed to be.  It was

22    abundantly clear that the Capitol Police officers had been

23    overwhelmed and that rioters had surged into restricted

24    areas.

25           In Mr. Dennison's view, the *mens rea* requirement

1    applies to each of the factual elements in 1742(a)(1), that

2    he knew he entered, he knew the building or grounds was

3    restricted and he knew he lacked lawful authority.

4          As I said at the beginning of this trial, I, too,

5    think that is the right way to understand the 1752's

6    knowledge requirement.

7          Regardless whether we use the Government's

8    elements or the Defendant's, I find the Government has

9    carried its burden here.

10          I find that Mr. Dennison knew he entered the

11    Capitol; he knew the building was restricted because he

12    stood behind people who forced their way in without any kind

13    of security screening and against the verbal commands and

14    physical presence of police officers; and he knew he lacked

15    lawful authority to be there.  Indeed, officers were

16    actively trying to keep people out of the building at the

17    time.

18          Mr. Dennison also thinks the term "otherwise

19    restricted" means visually or verbally demarcated in a way

20    that gives clear on-site notice that an area is accessible

21    only to certain authorized people.  And I'm looking to the

22    proposed jury instructions at Note 3.

23          Even under this view, there is no question that

24    the Senate wing corridor was restricted at the time

25    Mr. Dennison entered.  Any reasonable person would look

1    around at the broken glass, the forced entries and the

2    police presence and come to this conclusion.

3         Mr. Dennison also argues that 1752(a) requires the

4    Government to prove that he knew that the vice president was

5    then or would be present within that area.

6         Although I have ruled that 1752 does not require

7    this specific kind of knowledge, Mr. Dennison did know

8    beyond a reasonable doubt that Vice President Pence was

9    certifying electoral votes in the Capitol Building that day.

10   Just weeks before the riot, he said he wanted his presence

11   felt on, quote, "Jan 6," which is, quote, "when Congress

12   would meet to review and certify the electoral votes with VP

13   Pence presiding."  And I'm looking to Exhibit 205.

14        I therefore find Mr. Dennison guilty on Count 1.

15        Count 2 charges Mr. Dennison with disorderly or

16   disruptive conduct in a restricted building in violation of

17   18 USC 1752(a)(2).

18        Disorderly conduct occurs when a person is

19   unreasonably loud and disruptive under the circumstances or

20   interferes with another person by jostling against or

21   unnecessarily crowding that person.

22        Disruptive conduct is a disturbance that

23   interrupts an event, activity or the normal course of a

24   process.

25        The terms "restricted building or grounds" and

1    "knowingly" have the same meanings described in the

2    instructions for Count 1.

3         The first element is that Defendant engaged in

4    disorderly or disruptive conduct in or in proximity to any

5    restricted building or grounds.

6         My earlier findings about a restricted area apply

7    here too.  I find that, at the very least, Mr. Dennison

8    engaged in disruptive conduct.  He carried a flag into the

9    Capitol Building without going through any type of screening

10    in the midst of a violent riot that had broken out in the

11    Capitol Building.  I think this certainly qualifies as

12    disruptive.

13         The second element is that the Defendant did so

14    knowingly and with the intent to impede or disrupt the

15    orderly conduct of government business or official

16    functions.

17         I think this is the most difficult element for the

18    Government, as Mr. Dennison was only in the building for

19    about a minute and seems to have been filming what was going

20    on inside rather than yelling or flag-waving or engaging in

21    more violent conduct like some of those around him.

22         However, I agree with the Government that his own

23    words convict him here.

24         Weeks before riot, Mr. Dennison knew that Congress

25    was going to certify the Electoral College votes on

1    January 6th.  I already noted how he said as much.

2         In his words, he went to D.C. to #FightforTrump,

3    and he said he wanted our presence to be felt on

4    January 6th.  On this day, he continued, quote, "Trump can

5    be declared the winner.  We intend to see it happens,"

6    closed quote, all from Exhibit 205.

7         But I think the most probative evidence comes from

8    his statement made hours after he broke into the Capitol

9    Building.  Most notably, he went to the Capitol on

10   January 6th and, quote, "stormed in with," closed quote,

11   other protesters.  And I'm looking again to Exhibit 205.

12   His words suggest a clear intent to disrupt the

13   certification process in association with fellow rioters.

14        To be sure, he also distanced himself from people

15   whom he described as agitators, members of Antifa and people

16   who wanted to fight cops.

17        But I disagree with any suggestion that he just

18   wanted to document what was happening or wanted to witness

19   history.  Again, his Facebook posts show that he went to

20   D.C. with a clear plan to #FightforTrump and make his

21   presence felt.

22        And although Mr. Dennison's conduct may not have

23   amounted to much, it's clear that he intended to join up

24   with a larger body to disrupt Congress.

25        Indeed, Mr. Dennison worked his way through the

1    throngs of protesters on the Capitol's west lawn, up through

2    the scaffolding, to some of the most intense areas of the

3    riot where he said he had witnessed someone break a window

4    with a hammer, and then he streamed into the Capitol

5    Building with other rioters who were facing off with police.

6         Later that evening, he explained, quote, "They did

7    fight the cops once the cops were shooting people.  They

8    were hitting them in waves, and the cops were all lying on

9    the ground, overwhelmed by the patriots who had no weapons,"

10   closed quote, from Exhibit 205.

11        And when he was debriefing his experience on

12   Facebook, he claimed the protesters, quote, "could have

13   taken the Capitol entirely over," closed quote, without guns

14   because, quote, "there were way too many of us," closed

15   quote, all from Exhibit 205.

16        Under these circumstances, I find that

17   Mr. Dennison intended the natural results of his actions,

18   which were to exacerbate a dangerous and disruptive

19   situation, overwhelm the police and delay the certification

20   process.

21        Third, the Defendant's conduct occurred when or so

22   that his conduct, in fact, impeded or disrupted the orderly

23   conduct of government business or official functions.

24        This element is easily met.  As Inspector Hawa

25   testified, the Capitol went into lockdown at around

1    2:00 p.m. because rioters had breached the security

2    perimeter.   The Capitol remained in lockdown until later

3    that evening because of the continued presence of the

4    rioters.   The Government's witnesses testified that Congress

5    could not resume until all rioters were cleared from the

6    building.

7            This disrupted and delayed the certification of

8    the Electoral College votes for many hours.   Mr. Dennison's

9    presence in a small but legally significant way was in part

10   to blame for this delay.

11           I therefore find him guilty on Count 2.

12           Count 3 charges Mr. Dennison with disorderly or

13   disruptive conduct in a Capitol building or grounds in

14   violation of 40 USC 5104(e)(2)(D).

15           The first element of this offense is that the

16   Defendant engaged in disorderly or disruptive conduct in any

17   of the Capitol buildings or grounds.

18           My findings for disorderly and disruptive conduct

19   for Count 2 apply here.   So I find the Government has met

20   this element.

21           The second element is that the Defendant did so

22   with the intent to impede, disrupt or disturb the orderly

23   conduct of a session of Congress or either house of

24   Congress.

25           I find this element is met, too.   As I noted

1    before, Mr. Dennison's prior Facebook posts display a

2    notable understanding of the certification process and when

3    and where it was to occur.  I'm looking to Exhibit 205.

4            After attending the Stop the Steal Rally, he

5    walked down the Mall and made his way through thousands of

6    people, through a temporary scaffolding structure, and past

7    broken windows and signs of mob violence into the Capitol

8    Building carrying a flag with hundreds of others rioters at

9    the time Congress was supposed to be certifying the

10   electoral vote.  He said, of other rioters that night, that

11   they definitely made their presence felt.  I am looking to

12   Exhibit 205 again.

13           I think he did, too.  This all demonstrates a

14   clear intent to impede, disrupt and disturb the

15   certification process.

16           He third element is that he acted willfully and

17   knowingly.  My earlier findings demonstrate this element as

18   well.

19           Accordingly, I find him guilty on Count 3.

20           Count 4 of the superseding information charges the

21   Defendant with parading, demonstrating or picketing in a

22   Capitol building in violation of 40 USC 5104(e)(2)(G).

23           The terms "parade" and "picket" have their

24   ordinary meanings.  The term "demonstrate" refers to conduct

25   that would disrupt the orderly business of Congress by, for

1    example, impeding or obstructing passageways, hearings or

2    meetings, but does not include activities such as quiet

3    praying.

4         The term "United States Capitol buildings" has the

5    same meaning described in the instructions for Count 3.  The

6    terms "knowingly" and "willfully" have the same meanings as

7    described in the instructions for Count 1 and 3,

8    respectively.

9         In order for the Defendant to be found guilty of

10   this offense, the Court must find that the Government proved

11   each of the following elements beyond a reasonable doubt:

12        First, that the Defendant paraded, demonstrated or

13   picketed in any of the United States Capitol buildings.  I

14   believe my prior findings satisfy this element.  In short,

15   carrying a flag along with hundreds of other rioters into

16   the Capitol Building itself while Congress is supposed to be

17   meeting would certainly qualify as parading and

18   demonstrating, if not picketing.

19        Second, the Defendant acted willfully.  I think my

20   prior findings also demonstrate Mr. Dennison's willfulness

21   and knowledge.  His statements hours later that, quote, "I

22   stormed in with them" most clearly satisfies this element.

23        I therefore find Mr. Dennison guilty on Count 4.

24        Before I turn to the final charge, I want to make

25   clear that I think Mr. Dennison's actions on January 6th put

1    him on the less culpable end of the spectrum of January 6th

2    defendants I've seen.  Even among those charged only with

3    misdemeanors, Mr. Dennison's presence in the Capitol for

4    less than two minutes, during which time he primarily films

5    what is happening, is -- suggests pretty minimal misconduct.

6         However, I do think the Government has proven each

7    of the charges beyond a reasonable doubt, and I think the

8    mitigating factors I just mentioned are more relevant to

9    sentencing.  They do not undermine the Government's proof as

10   to each element of the offense.

11        Count 5 of the superseding information charges him

12   with failure to appear in violation of 18 USC 3146(a)(1).

13        In order to find the Defendant guilty of this

14   offense, the Court must find that the Government proved each

15   of the following elements beyond a reasonable doubt:

16        First, that the Defendant knowingly failed to

17   appear before a judge or magistrate judge of this Court as

18   required by the conditions of his release and, second, that

19   an offense charged in the case in which the Defendant had

20   been released on bail was punishable by a term of one year's

21   imprisonment.

22        It is an affirmative defense to a prosecution for

23   failure to appear, and the Defendant would not be guilty,

24   if, A, uncontrollable circumstances prevented the Defendant

25   from appearing; B, the Defendant did not himself contribute

1    to the creation of such circumstances in reckless disregard

2    of the requirement to appear; and, C, the Defendant appeared

3    as soon as such circumstances ceased to exist.

4            There's no question that Mr. Dennison failed to

5    appear for his January 5th, 2023, trial date before this

6    Court.  I also find that he did so knowingly.  Not only had

7    he been repeatedly instructed about the date, but

8    Government's Exhibit 608 suggests that he moved all around

9    the country in the days and months afterwards.

10           This is all highly reflective of someone on the

11   run, as is the evidence that he made purchases from a,

12   quote, "off-the-grid company."

13           Finally, I credit Agent Bahn's testimony that

14   Mr. Dennison refused to surrender when law enforcement

15   finally did catch up with him and that the SWAT team had to

16   be summoned.  In short, the evidence is overwhelming that he

17   knowingly failed to appear for his trial.

18           I also note that the 1752 offense he was facing --

19   offenses he was facing each were punishable by a maximum

20   term of one year's incarceration.  I'm looking to 18 USC

21   1752(b)(2).

22           Mr. Dennison offered no evidence on this count,

23   certainly nothing that would allow for an affirmative

24   defense.

25           I also reject the suggestion that he thought he

1    was entitled to fight the charges in some other way rather

2    than by appearing for his trial.  The order to appear for

3    trial was simple and unequivocal.  He knew full well that he

4    was supposed to be here, and he chose to make a run for it

5    instead.

6            The result would be the same even if I adopted

7    Mr. Dennison's proposed elements.  He was released from

8    custody under the Bail Reform Act -- and I'm looking to

9    Exhibit 601; he was required to appear in court before a

10   judicial officer -- and I'm looking to Exhibits 602 and 604.

11   He knew of this requirement and he intentionally failed to

12   appear.

13           I therefore find Mr. Dennison guilty on Count 5.

14           Mr. Ballou, do you have any question as to the

15   Court's verdict?

16           MR. BALLOU:  None, your Honor.

17           THE COURT:  And Ms. Akpan?

18           MS. AKPAN:  No, your Honor.

19           THE COURT:  Ms. Akpan, am I correct that you're

20   ready to proceed to sentencing?

21           MS. AKPAN:  Your Honor, if I could just have a

22   moment.

23           THE COURT:  Sure.

24           (Ms. Akpan confers with the Defendant privately.)

25           MS. AKPAN:  Thank you, your Honor.  We're ready.

 1          THE COURT:  And, Ms. Akpan, do you agree with the

 2    Government's calculation of the guidelines?

 3          MS. AKPAN:  Yes.  Yes, we do, as the Government

 4    laid it out on Page 5 of their trial brief.

 5          THE COURT:  Okay.  Mr. Ballou, are you ready to

 6    proceed to sentencing?

 7          MR. BALLOU:  We are, your Honor.

 8          THE COURT:  All right.  We'll now move directly

 9    into sentencing for Victor Sean Dennison, who has just been

10    convicted on all counts in the superseding information.

11          I do believe it's appropriate to proceed

12    immediately to sentencing in light of Defendant's current

13    incarceration and the potential for -- if I waited to do a

14    PSR, I think he may well serve more time in custody than he

15    would have been otherwise sentenced to.  I think the parties

16    both agree and are prepared to move to sentencing, and there

17    is no dispute as to the appropriate sentencing guideline

18    calculations.

19          I've received the Government's sentencing

20    recommendation, which includes its trial brief -- which it

21    included in its trial brief on August 26th.  Are there any

22    other documents or materials that I should have reviewed

23    other than those trial exhibits that I just saw, Mr. Ballou?

24          MR. BALLOU:  None, your Honor.  If we have the

25    opportunity to make a brief statement, we will.  But we'll

1    do whatever you prefer.

2                THE COURT:  You will.

3                Ms. Akpan?

4                MS. AKPAN:  I haven't submitted anything, but

5    we're prepared to argue today.

6                THE COURT:  Okay.  Mr. Dennison, this sentencing

7    hearing will proceed in three steps.  The first step is to

8    calculate your recommended sentence under the sentencing

9    guidelines, to the extent they're applicable.

10               The second step is to hear from the Government,

11   from your attorney, and you, sir, if you wish to be heard

12   about sentencing in this case.

13               And the last step requires the Court to fashion a

14   just and fair sentence in light of the factors Congress set

15   out in 18 USC 3553(a).  As part of this last step, the Court

16   will actually impose the sentence along with the other

17   required consequences of this offense.

18               The guidelines only apply to Counts 1, 2 and 5

19   because they are each Class A misdemeanors.  The guidelines

20   do not apply to Counts 3 and 4 because they are both Class B

21   misdemeanors.

22               The base level for Count 1 is 4.  And this carries

23   a two-level enhancement because the trespass occurred in a

24   restricted building or grounds.  I'm looking to

25   2B2.3(b)(1)(A) for this.

1        So the subtotal for Count 1 is 6.

2        Count 2 carries a base offense level of 10

3    according to Guideline 2A2.4(a).

4        Count 5 carries a base offense level of 6,

5    according to 2J1.6.

6        I group Counts 1 and 2 because they share a common

7    victim, Congress, while Count 5 forms its own group,

8    Group 2, according to Guideline 3D1.2(a).

9        Group 1 has an offense level of 10 and Group 2 has

10    an offense level of 6.

11        The combined offense levels for these groups is 10

12    because Group 1 carries the highest offense level, yet it is

13    only four levels more serious than Group 2, so only one unit

14    gets added to Group 1, producing no increase in the combined

15    offense level under 3D1.4.

16        Mr. Dennison merits a two-point downward

17    adjustment because he is a so-called zero-point offender

18    under Guideline 4C1.1, but he receives a two-point upward

19    adjustment under 3C1.1 for obstructing justice by his flight

20    from prosecution.

21        All told, the offense level is 11.

22        Mr. Dennison has no prior criminal history,

23    putting him in Criminal History Category I.

24        So with a total offense level of 10 and a criminal

25    history category of I, the guidelines range applicable to

1    him is six to 12 months.

2            Are there any objections to these calculations?

3    Mr. Ballou?

4            MR. BALLOU:  No, your Honor.

5            THE COURT:  And Ms. Akpan?

6            MS. AKPAN:  I'm sorry, your Honor.  I did not hear

7    the Court address 4C1.1.

8            THE COURT:  I did.

9            MS. AKPAN:  I'm sorry.

10            THE COURT:  I said he's a two-point -- he gets two

11    points reduced on that --

12            MS. AKPAN:  I'm sorry.  Yes.

13            THE COURT:  -- which would take him to -- so he

14    gets two points back under 3C --

15            MS. AKPAN:  I'm sorry.  Yes, no objection to that,

16    your Honor.

17            THE COURT:  Okay.  So I think the total offense

18    level is actually 11, though, not 10.  Am I -- did I

19    miscalculate that?  Regardless, it's a six to 12 range.

20            The Court will now discuss the remaining

21    applicable penalties, which include imprisonment, probation,

22    fines and restitution.

23            Counts 1, 2 and 5 are each Class A misdemeanors

24    that carry a maximum sentence of one year imprisonment.

25            By law, a term of imprisonment for Count 5, the

 1   failure to appear, shall be consecutive to the sentence of

 2   imprisonment for any other offense.

 3          The Government has suggested, however, that the

 4   overall range or the -- the total sentence should still be

 5   guideline-compliant unless there's a reason to vary or

 6   depart.

 7          But I would separate the different sentences to

 8   add up to a potentially guideline-compliant sentence.

 9          And to be clear, I think it is 10 for a total

10   offense level.

11          Counts 3 and 4 are each Class B misdemeanors

12   carrying a maximum sentence of six months' imprisonment.

13          The maximum fine for Counts 1, 2 and 5 is

14   $100,000.  The maximum fine for Counts 3 and 4 is $5,000.

15   The guidelines recommend a fine range of between $4,000 and

16   $40,000.

17          Class A misdemeanors -- that's Counts 1, 2 and

18   5 -- carry a mandatory special assessment of $25 each.  And

19   the Class B misdemeanors, Counts 3 and 4, carry a mandatory

20   special assessment of $10 each.

21          The Court may impose a term of supervised release

22   of not more than one year under Counts 1, 2 and 5.  And the

23   guidelines range for supervised release is one year.

24          Mr. Dennison is eligible for a sentence of

25   probation not exceeding five years, and the guideline range

1    for a sentence of probation is between one and five years.

2                 Restitution may be required under 3663.

3                 Have I accurately stated the sentencing --

4    statutory framework under which we are operating in regard

5    to this case?  Mr. Ballou?

6                 MR. BALLOU:  To our knowledge, yes.

7                 THE COURT:  And Ms. Akpan?

8                 MS. AKPAN:  Yes, your Honor.

9                 THE COURT:  I must now consider the relevant

10   factors that Congress set out in 18 USC 3553(a) to ensure

11   the Court imposes a sentence that is sufficient but not

12   greater than necessary to comply with the purposes of

13   sentencing.

14                These purposes include the need for the sentence

15   imposed to reflect the seriousness of the offense, to

16   promote respect for the law and to provide just punishment

17   for the offense.  The sentence should also afford adequate

18   deterrence to criminal conduct, protect the public from

19   future crimes of the Defendant and promote rehabilitation.

20                In addition to the guidelines and policy

21   statements, I must consider the nature and circumstances of

22   the offense, the history and characteristics of the

23   Defendant, the need for the sentence imposed, the guideline

24   ranges, the need to avoid unwarranted sentence disparities

25   among defendants with similar records who have been found

1    guilty of similar conduct and the types of sentences

2    available.

3              Does the Government wish to be heard on the

4    application of factors set forth in 3553(a), request a

5    variance or otherwise make a sentencing recommendation?

6              MR. BALLOU:  Very briefly, your Honor.

7              THE COURT:  All right.

8              MR. BALLOU:  Thank you, your Honor.

9              We agree with your conclusion that, of all the

10   January 6th cases, this is on the less serious end of the

11   scale for Mr. Dennison's conduct in the Capitol Building.

12             We nevertheless recommended a substantial

13   sentence, or a meaningful sentence, for three reasons, two

14   of which I think were clear through the course of the

15   testimony yesterday.  One is a little less obvious.

16             The first is the situation of specific deterrence

17   here.  We have a Defendant who thus far has demonstrated not

18   only no remorse for his actions on January 6th, which we saw

19   in his subsequent Facebook posts, but also no respect for

20   this Court or for law enforcement, not just by his failure

21   to appear, but as you well know, by his numerous disruptions

22   in court leading up to trial.

23             This was an enormously disruptive and disrupted

24   process that we had all hoped to avoid.  And my concern is

25   that, absent a substantial sentence, Mr. Dennison is not

1    going to learn anything from this experience and may, in

2    fact, be emboldened.

3              The second point is related, which is one of

4    general deterrence.  I don't need to tell anybody in this

5    courtroom that we have an upcoming election.  And no matter

6    what the political side, we have a risk of violence no

7    matter who wins.

8              For that reason, it's necessary to make sure that

9    people who might engage in conduct similar to Dennison's are

10   adequately deterred from doing so next year.

11             The final point I'd like to make is about

12   Mr. Dennison's flight from prosecution.  As you said, this

13   is in some sense a *de minimis* case.  And we certainly did

14   not want to expend the resources that we had to in order to

15   capture him.

16             But we had no way of knowing at each step of the

17   way how much work was going to be involved in finding

18   Mr. Dennison and where he was going to go next.

19             As we heard from testimony from Special Agent

20   Bahn, at various points we thought we were near to capturing

21   him, but we decided that it was not sufficiently safe for

22   officers or for the public to do so.

23             As a result, the Government had to expend

24   significant resources to capture Mr. Dennison.  And even

25   when Mr. Dennison was found, as you said just today, he

1    refused to give himself up to the police, and SWAT had to be

2    involved.

3          For this reason, we think it's very important that

4    Mr. Dennison receive a substantial sentence, in recognition

5    of the considerable resources he drew from the Government in

6    order to bring him to justice.

7          Thank you.

8          THE COURT:  Mr. Ballou, I think you recommended

9    150 days, which, if my math is correct, is a downward

10   variance.  Is that correct?  And if so, what's the basis for

11   a downward variance?

12         MR. BALLOU:  We confess, your Honor, we went to

13   law school, not math school.  It probably should have been

14   180 days to fit within the six months' guideline.  The way

15   that we reached this was to come up with a baseline for his

16   January 6th offenses that was consistent with your previous

17   sentences, and then look to the cases where somebody had

18   been sentenced for a failure to appear on a misdemeanor

19   case.  And that gave us the sort of four-to-one sort of

20   benchmark for the underlying offense sentence and then the

21   failure to appear.

22         I have to say, we found only a single federal case

23   based on a misdemeanor underlying offense for a failure to

24   appear.  So that four-to-one framework is more of a

25   guesstimate than any sort of rule that we seem to see across

 1    cases.

 2            So in that sense, I think an in-guidelines

 3    sentence would make sense, your Honor.

 4            THE COURT:  Okay.  I understand.  Thank you.

 5            Ms. Akpan, do you wish to be heard on the

 6    application of the factors set forth in 3553(a), request a

 7    variance or otherwise make a sentencing recommendation?

 8            MS. AKPAN:  Yes, your Honor.

 9            Your Honor, I'm going to try to deal with a few of

10    the factors kind of at the same time.  I know that we're

11    very familiar with the facts of the case.

12            In looking back, I would say that there's some

13    things I wish I had brought out a little bit more for the

14    Court to understand, one of them being Mr. Dennison's

15    history and characteristics a little bit more, particularly

16    because I do think that that affected the flight.

17            You heard from Mr. Dennison and then you also

18    heard from Agent Bahn about Mr. Dennison's work experience,

19    which is as a musician.  Obviously, he's not a nationally

20    recognized musician.  He plays local gigs, as I understand,

21    and then has intermediate jobs.

22            My understanding is that actually is -- when you

23    look at the maps, a lot of the locations where he was was

24    picking up those different types of jobs.

25            But I think it's important to note, too, that at

1    the very beginning of the testimony, I think, by -- Agent

2    Bahn testified that he was originally arrested, I think,

3    along the California-Mexico border.  And so I think it's --

4    perhaps I just didn't mention it, because I thought it was

5    so obvious, that if he wanted to flee, he could have gone to

6    Mexico, and didn't.

7            And so we think that's actually a reason why our

8    request is reasonable, which would be a time-served

9    sentence.

10           I do want to acknowledge, too, that Mr. Dennison,

11   as you also are aware, is married.  His wife has been

12   present for this trial.  She's sitting in the second -- I

13   think second row.

14           And obviously, he's close to her and wanted to

15   consult with her when it came to making a decision about

16   whether to testify or not.

17           I did address, though, for the Court that the

18   decisions that Mr. Dennison made were I think were highly

19   informed by some of the claims that he thought would be

20   successful, where -- as I had put it, kind of the sovereign

21   citizen claims, for lack of a better phraseology on that,

22   and -- which is why we think that this kind of undercuts,

23   say, cases that I think courts have seen where people are

24   really just willfully just, you know, thumbing their nose at

25   the court.

1          And so to the extent that the Court has viewed him

2     as disruptive throughout the -- throughout this process, I

3     think it's been highly because of the way that the

4     presentation of those claims have come about.  I've seen

5     that in a few other cases.  And so it doesn't surprise me as

6     far as the conduct or the behavior.

7          As to the nature and circumstances of the offense,

8     I do want to reiterate for the Court that we do agree with

9     the Government:  This conduct is very, very minimal.  In

10    fact, when I look at cases where individuals were sentenced

11    for being in and out of the Capitol in just a few minutes,

12    they got probationary sentences.

13         And your Honor has -- for 1752 cases, has

14    sentenced people to a few days of incarceration.  So, for

15    example, in a Dana Winn case -- in that case, there was a

16    co-defendant, Rachael Pert.  She and her co-defendant have

17    recorded a video about them stopping the vote, so they

18    actually -- those words came out of their mouths.  And that

19    was their goal.  And they were -- they went inside the

20    Capitol Building shortly after the breach.

21         And I believe your Honor gave Ms. Pert 24 months'

22    probation and Ms. Winn ten days' incarceration, I think

23    intermittent with 12 months' probation.

24         In the case of Kevin Gordon, your Honor gave that

25    individual 12 months' probation.  He was sentenced on a

1     1752(a)(a).  He and his brother had entered the Senate wing

2     doors at 2:25, which was shortly, I think, after the second

3     breach at that door, and went through the Capitol, into the

4     Crypt, and boasted about being inside the Capitol.

5                Again, those facts are not present here.

6                You have sentenced Ms. Jenny Cudd to 60 days'

7     probation.  She entered, I think, the same door at 2:24.

8                And -- I'm sorry.  I might have put that name down

9     wrong.  That case number is 21-CR-068, if I have that

10    correct.

11               I believe that individual actually went inside the

12    Speaker's conference room, put the feet on the table of,

13    took a Corona beer, light beer, out of the mini-fridge.  And

14    that person got 60 days' probation.

15               There's, of course, the Couy Griffin case where he

16    got 14 days' incarceration and 12 months of supervised

17    release.  He had climbed over that Olmsted wall that we

18    talked about yesterday, and he talked about breaking down

19    the door and not being able to -- and couldn't wait to get

20    in.

21               And the last case -- I know that your Honor has a

22    lot of cases, but I just wanted to highlight for the record

23    there was also the Mick Chan case, which I believe went to a

24    bench trial.  And he wore safety goggles, going into the

25    Capitol, cut away tarps -- portions of the tarp that we

1    looked at yesterday.  He also got into the building, took a

2    recording of himself putting his middle finger up at the

3    video.  And I understand he got a three months' sentence.

4          None of that conduct is present here when we're

5    talking about the 1752 cases.

6          And so when -- we do understand, of course, that

7    your Honor would have to sentence him consecutive for

8    Count 5.  But our request is that he receive two weeks for

9    the time -- for the charges that you found him guilty on,

10    the January 6th charges, and then the remaining time be

11    credited towards the sentence of time served because he has

12    been detained for -- since April until now for the --

13    obviously with the Bail Reform Act charge.

14          And I think that that sentence is not

15    unreasonable, considering your sentences and other sentences

16    individuals have received in this court.

17          I do want to address the fines, briefly, again.

18    Mr. Dennison obviously qualified for public defender

19    services, and so we would ask that no fine -- aside from the

20    special assessments that have to be imposed, we'd ask for no

21    fines, in part because of the -- he's been unemployed for

22    the last four months.  He's also -- works intermittent jobs.

23          As for the Government's reference to an election

24    coming up, I don't think that there is any concern that

25    Mr. Dennison would actually do this kind of conduct again.

1    I do think that this has been a quite difficult road for him

2    and his family, considering the fact that he's been detained

3    for the last four months.

4         Dare I say that he made decisions that obviously

5    didn't help him in the defense of this case.  But I do think

6    that those lessons are embedded in him quite deeply.  And so

7    I don't think that there needs to be any further supervision

8    here.  I don't expect that Mr. Dennison is going to come

9    back to the Capitol and do anything regarding the next

10   election.  I don't think that the Government has pointed to

11   anything like that.

12        And so that's the reason why I'm asking for no

13   supervision to follow.

14        Thank you, your Honor.

15        THE COURT:  Thank you, Ms. Akpan.

16        Mr. Dennison, you have the right to make a

17   statement or present any information to mitigate the

18   sentence.  Would you like to say anything that you would

19   like me to consider before imposing sentence?

20        MS. AKPAN:  Your Honor, could I just have one

21   moment?

22        THE COURT:  Sure.

23        MS. AKPAN:  (Confers with the Defendant

24   privately.)

25        Thank you, your Honor.

1          I understand that Mr. Dennison doesn't wish to

2     make a statement.

3          THE COURT:  Okay.  That's fine.

4          Mr. Dennison, could you approach the podium, sir.

5          Sir, I've assessed the particular facts of this

6     case in light of the relevant 3553(a) factors, and I now

7     want to provide remarks for the record and for you, sir,

8     about my considerations in regard to the nature of the

9     offense and your history and characteristics.

10          On January 6th, you participated in a large and

11     violent riot that broke into the Capitol Building and caused

12     substantial delays to the certification of the electoral

13     vote.

14          You admitted to seeing someone breaking a window

15     with a hammer and seeing other people fighting police

16     officers.  You knew that the presence of you and the other

17     rioters mattered, that it could have an impact on the

18     outcome of the process.  And yet you stayed.  As you said,

19     "I stormed in with them."

20          And of course, this is not a situation where I

21     have any evidence of remorse or recognition that you

22     shouldn't have done this or that you're not going to do it

23     again.

24          Having said that, as I mentioned a few moments

25     ago, your conduct was pretty minimal compared to many other

1    rioters.  You were only inside the building for less than

2    two minutes.  You just filmed what was going on inside.

3    According to you, you de-escalated a standoff between

4    another rioter and an officer.

5            I also note that you have no prior criminal

6    history.  I think all of these factors argue in your favor

7    and would suggest little, if any, incarceration is

8    necessary.

9            In fact, as Ms. Akpan pointed out, I have not

10   sentenced to incarceration people who engaged in, frankly,

11   more serious conduct on January 6th.  But almost all of them

12   accepted responsibility.  Almost all of them showed remorse.

13           And the big difference, sir, is your conduct after

14   you were initially arrested.  I feel like it's been pretty

15   shocking.  You repeatedly interrupted me and failed to

16   follow directions in the pretrial status conference --

17   conferences, resulting in me having to remove you from the

18   courtroom on several occasions.

19           Frankly, I've never had to do that so many times

20   in one case.  And most flagrantly, you failed to appear for

21   your trial, instead, going on a ten-month flight around the

22   country.

23           I accept Ms. Akpan's explanation in part for your

24   peripatetic lifestyle, but I do think you certainly knew you

25   were supposed to be in trial, and you are clearly a smart

1    enough man to know that, by moving around frequently, you

2    are going to be harder to recapture.

3           Once you were tracked down, you refused to

4    cooperate with law enforcement, creating a potentially very

5    dangerous situation for yourself and everyone else.  All of

6    this calls for a significant sentence, both to promote

7    respect for the law and to provide just punishment for the

8    offense, but also to deter you and others from similar

9    actions in the future.

10           I do note that you've been completely compliant

11    during trial; and frankly, but for that, your sentence would

12    be significantly higher than what I intend to impose.

13           Ultimately, I agree with the Government that a

14    sentence at the low end of the guidelines is appropriate,

15    with most of the punishment being focused on your failure to

16    appear.

17           Although I recognize the guidelines are voluntary,

18    I think they are an appropriate range, given all of the

19    3553(a) factors in this case, and see no reason to vary

20    downward from them.

21           Sir, you're clearly a talented man with a wife who

22    cares a lot about you, and you've got a lot going for you.

23    You made a mistake on January 6th, but your actions since

24    then have turned a relatively minor mistake into one that's

25    much more serious.

1          Whether you agree with them or not, federal laws

2    and the criminal justice system apply to you.  I urge you to

3    reject this sovereign citizen ideology and not to ruin the

4    bright future that should be ahead for you.

5          I will now impose the sentence.

6          It is the judgment of the Court that you, Victor

7    Sean Dennison, are herby sentenced to serve 30 days'

8    incarceration on Counts 1 to 4 each, and 150 days on

9    Count 5.

10          The sentences on Counts 1 to 4 shall be concurrent

11    to each other, but consecutive to the sentence in Count 5.

12          You shall also serve one year of supervised

13    release on Counts 1, 2 and 5.  All terms of supervised

14    release are to be concurrent.

15          You are also ordered to pay $95 in special

16    assessments.  The $95 special assessment is immediately

17    payable to the Clerk of the Court for the U.S. District

18    Court for the District of Columbia.

19          While on supervision, you shall abide by the

20    following mandatory conditions, as well as the standard

21    conditions of supervision in AO Form 245B, which are imposed

22    to establish the basic expectations of your conduct while on

23    probation.

24          The Court is waiving any drug testing requirement,

25    given the lack of any suggestion that that's an issue here.

1          The mandatory conditions include:  You must not

2     commit another federal, state or local crime; you must not

3     unlawfully possess a controlled substance; you must refrain

4     from any unlawful use of a controlled substance.

5          You shall also abide by the following special --

6     actually, I'm not imposing any special conditions.

7          Pursuant to 18 USC 3742(a), you have the right to

8     appeal the sentence imposed by this Court if the sentence

9     was imposed in violation of law, imposed as a result of the

10    incorrect application of the sentencing guidelines, is above

11    the applicable guideline range or, for a Class B

12    misdemeanor, is plainly unreasonable.  If you choose to

13    appeal, you must file any appeal within 14 days after the

14    Court enters judgment.

15         As defined in 28 USC 2255, you also have the right

16    to challenge the conviction entered or sentence imposed if

17    new and currently unavailable information becomes available

18    to you or on a claim that you received ineffective

19    assistance of counsel.

20         If you are unable to afford the cost of an appeal,

21    you may request permission from the Court to file an appeal

22    without cost to you.

23         Are there any objections to the sentence imposed

24    that are not already noted on the record?  Mr. Ballou?

25         MR. BALLOU:  None, your Honor.

```
 1                 THE COURT:  And Ms. Akpan?

 2                 MS. AKPAN:  Yes, your Honor.  For those that are

 3       noted on the record and for -- I believe I addressed it

 4       already about the sovereign citizen claims, which I didn't

 5       hear your Honor's response, but I want to make sure I'm

 6       doing this right by the -- so I just wanted to note that we

 7       do object under the sovereign citizen --

 8                 THE COURT:  I understand.  All right.  Thank you.

 9                 Good luck to you, sir.  Please step back with the

10       marshal.

11                 THE DEFENDANT:  Thank you.

12                 THE COURT:  Ms. Akpan, can you approach?

13                 (Confers with defense counsel privately.)

14                 THE COURT:  Thanks, folks.  Have a good afternoon.

15                 (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25
```

1                        **<u>CERTIFICATE</u>**

2

3                 I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10               Dated this 10th day of October, 2024.

11

12            <u>/s/ Lisa Edwards, RDR, CRR</u>
              Official Court Reporter
13            United States District Court for the
                District of Columbia
14            333 Constitution Avenue, Northwest
              Washington, D.C. 20001
15            (202) 354-3269

16

17

18

19

20

21

22

23

24

25